IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No. 22-cr-00389-1 |
| ANTWUAN TRAINER | Judge Mary M. Rowland |

**MEMORANDUM OPINION AND ORDER**

Defendant Antwaun Trainer is charged with knowing possession of and intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1), and with conspiracy to do same in violation of 21 U.S.C. § 846. Before the Court now is Mr. Trainer's motion to suppress [98] evidence seized on December 6, 2021, following postal inspectors' entry into Mr. Trainer's sister's home. For the reasons stated herein, Mr. Trainer's motion is denied.

I.  Background[1]

On December 3, 2021, a package addressed to Mr. Trainer at 1212 Ashland Avenue in Chicago Heights was intercepted at a United States Postal Service ("USPS") facility and identified as potentially containing narcotics. After obtaining a search warrant, postal inspectors opened the parcel and found a container containing white power, which testing revealed was an illegal narcotic.

---

[1] These facts are drawn from the testimony elicited at the evidentiary hearing held on December 16, 2024 [130] as well as the agreed upon facts in Mr. Trainer's and the Government's briefing.

1

Postal inspectors planned to conduct a controlled delivery of the parcel to the address on the package, and to that end, they obtained an order authorizing the installation of tracking and trigger devices in the parcel. The postal inspectors replaced the white powder in the parcel with a non-narcotic substance and re-wrapped the package. The postal inspectors also put a theft detection powder on the substance that temporarily turns skin purple upon contact. The re-packed parcel also included a GPS tracker to allow the inspectors to monitor its location and determine whether the package had been opened.

On December 6, 2021, the inspectors applied for and obtained an anticipatory search warrant that authorized the search of the home at 1212 Ashland Avenue upon the occurrence of either of two conditions: (1) the parcel was taken into the residence or (2) the parcel was opened after its delivery to the residence.

That same day, while a team of postal inspectors and local law enforcement were surveilling the area, an undercover postal inspector dressed as a postal carrier delivered the parcel to the front door of 1212 Ashland Avenue. Antwuan Trainer received the package and brought it inside the residence. After approximately 30 minutes, Mr. Trainer exited the house with a backpack, and the GPS tracker indicated that the parcel appeared to be travelling with Mr. Trainer and had not been opened.

Mr. Trainer took the backpack into his car and drove away. The postal inspectors then began a process that Agent McKeown, an inspector for USPS, described as "mobile surveillance," whereby the postal inspectors discretely followed Mr. Trainer.

For over two hours, they observed Mr. Trainer run different errands across the south suburbs in his car. They also observed him pick up a woman and several children from a residence in Park Forest. Agent McKeown testified at the suppression hearing that he believed Mr. Trainer was trying to conduct "countersurveillance," meaning that he believed Mr. Trainer had realized he was being surveilled and was trying to lose the inspectors.

At around 5:09 PM, Mr. Trainer arrived at 308 Wildwood Drive in Park Forest, a residential address where his sister lived. The postal inspectors arrived shortly thereafter and watched Mr. Trainer enter the residence's attached garage. The postal inspectors started to set up a surveillance perimeter around the house.

Approximately five minutes after Mr. Trainer entered 308 Wildwood Drive, and before the inspectors were able to finish setting up a surveillance perimeter, the inspectors received an alert that the parcel had been opened. Inspectors then entered the garage and went into the house. They found Mr. Trainer in a closet in the basement of the house, and they observed that his hands were stained purple in a manner that was consistent with having touched the purple theft detection powder that was placed in the fake narcotics. Agent McKeown testified that in his experience, when someone opened a package containing fake narcotics and exposed themselves to theft detection powder, such individuals commonly try to wash the powder off their hands and destroy other incriminating evidence.

After entering, the inspectors applied for a warrant to search the residence, but a magistrate judge denied that application at 11:56 PM. The inspectors left shortly

3

thereafter with the evidence they had collected from the home. Mr. Trainer was not arrested or charged that evening. He was charged nine months later, on August 8, 2022.

## II. Analysis

### A. Overview

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (cleaned up). To establish standing to assert a Fourth Amendment violation, a defendant must demonstrate that he had "a legitimate expectation of privacy in the premises searched." *United States v. Ostrum*, 99 F.4th 999, 1004 (7th Cir. 2024) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). The defendant is entitled to the suppression of any evidence discovered as a result of an illegal search. "The exclusionary rule is a judicially created remedy that prohibits the government from introducing at the defendant's trial evidence of guilt obtained through violations of the Fourth Amendment." *United States v. Ienco*, 182 F.3d 517, 526 (7th Cir. 1999).

The Court found during a hearing on March 11, 2025 that Mr. Trainer had a legitimate expectation of privacy in his sister's home at 308 Wildwood Drive. The Government nonetheless contends that the evidence obtained there should not be suppressed because (1) the inevitable discovery doctrine applies and (2) exigent circumstances justified law enforcements' entry into the residence. The Court addresses both arguments in turn.

B. Inevitable Discovery Doctrine

"The inevitable discovery doctrine provides that illegally obtained evidence will not be excluded if the government 'can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *United States v. Haldorson*, 941 F.3d 284, 293 (7th Cir. 2019) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). But the rule "is not an exception to be invoked casually." *United States v. Gravens*, 129 F.3d 974, 979–80 (7th Cir. 1997). To satisfy its burden, the Government must demonstrate that two criteria are met. "First, it must show that it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence; second, the Government must demonstrate that it would have conducted a lawful search absent the challenged conduct." *United States v. Marrocco*, 578 F.3d 627, 637–38 (7th Cir. 2009).

Here, the Government cannot establish by a preponderance of evidence that it can satisfy the first prong of the test. The Government applied for a warrant to search 308 Wildwood and the application was denied. In its briefing, the Government suggests that they perhaps could have sought a narrower warrant which a reviewing judge might have approved. But when the Government seeks "to use the doctrine of inevitable discovery to excuse its failure to have obtained a search warrant," it must "prove that a warrant would *certainly*, and not merely probably, have been issued had it been applied for." *Marrocco*, 578 F.3d at 639 (citing *United States v. Tejada*, 524 F.3d 809, 813 (7th Cir.2008) (emphasis added)). The Court cannot say by a

5

preponderance of the evidence that the magistrate judge would have certainly granted a hypothetical narrower warrant when the magistrate judge denied the only warrant that the Government actually sought.

The Government also argues that the inevitable discovery doctrine applies because, had they not entered the residence and waited for Mr. Trainer to exit, and "assuming Trainer did not destroy evidence by cleaning the powder from his hands," law enforcement would have arrested him when he exited and seized his phone. [117] at 23. But law enforcement *did* enter the home and they *did* see that Mr. Trainer had purple powder on his hands, and even after that they did not arrest him. Further, Agent McKeown testified that it was necessary to enter the home because in his experience, recipients of sham narcotics frequently attempted to destroy evidence after opening the tampered-with parcel. Had Mr. Trainer opened the parcel in his sister's home and had time to destroy evidence before exiting, there is no telling what, if anything, the Government may have been able to recover upon any eventual arrest. The Court thus cannot conclude by a preponderance of the evidence that law enforcement would have arrested Mr. Trainer and seized the obtained-evidence had they not entered the resident at 308 Wildwood without a warrant. The inevitable discovery doctrine thus does not apply.

C. Exigent Circumstances

The Government also contends that, even if Mr. Trainer had an expectation of privacy in his sister's residence, the search was nonetheless justified by exigent circumstances. A warrantless search is permissible "when the exigencies of the

situation make the needs of law enforcement so compelling" as to justify the search. *Kentucky v. King*, 563 U.S. 452, 459 (2011) (internal quotations and citations omitted). "[T]he need to prevent the imminent destruction of evidence has long been recognized as" an exigent circumstance that justifies a warrantless search. *Id*. at 460 (citations omitted). The Seventh Circuit has held that police are allowed to act on exigencies of their own making, but only if their conduct in creating the exigency was "reasonable" under the Fourth Amendment. *Hawkins v. Mitchell*, 756 F.3d 983, 993 (7th Cir. 2014) (citing *King*, 563 U.S. at 462).

Mr. Trainer argues that there was no exigency because law enforcement could have executed the warrant they obtained for 1212 Ashland Avenue as soon as Mr. Trainer took the package inside. They likewise could have executed it at any point while they were following Mr. Trainer for more than two hours around the south suburbs of Chicago. Indeed, they could have executed the warrant after he exited his car at his sister's home but before he entered it. Mr. Trainer further argues that to the extent any exigency existed, it was created by law enforcement's failure to exercise the warrant at an earlier point, and the seizure thus violates the Fourth Amendment.

The Seventh Circuit considered similar factual circumstances in *Limares*. There, postal inspectors intercepted a package of narcotics that was addressed to 148 E. Leith Street in Fort Wayne, Indiana. *United States v. Limares*, 269 F.3d 794, 796 (7th Cir. 2001). Agents repacked the parcel, replacing the actual narcotics with a sham substance and including a transmitter that would alert the agents when the

7

package was opened. *Id*. The agents obtained an anticipatory warrant authorizing them to enter the address after the delivery and opening of the package. *Id*. An individual named Ramirez signed for the parcel, using a fake name, and within minutes left the building carrying a bag large enough to contain the parcel. *Id*. Ramirez entered an address a few blocks away, and shortly thereafter the transmitter alerted the agents that the package had been opened. *Id*. Fearing that whoever opened the package would notice the transmitter and try to destroy any evidence, the agents entered without a warrant and recovered inculpatory evidence. *Id*. at 796-97. The Seventh Circuit rejected the defendant's argument that law enforcement' created any exigency, holding that it was Ramirez who "created the need for haste . . . by moving to a new address and then opening [the parcel]." *Id*. at 799.

     Mr. Trainer argues that the factual dissimilarities between the instant case and *Limares* render *Limares* inapposite. It is true that there are distinctions: here, unlike in *Limares*, law enforcement knew Mr. Trainer's identity prior to the sting operation. Further unlike *Limares*, law enforcement followed Mr. Trainer around for hours, and could have theoretically obviated any risk that he would destroy evidence by arresting him at any point after he received the package. But law enforcement agents are "not obliged to make arrests as soon as possible; they may continue investigations in order to acquire additional evidence." *Id*. at 788 (citing *Hoffa v. United States*, 385 U.S. 293, 309–10 (1966)). And the factual differences between the two cases do not change the underlying critical similarity — that once the parcel was opened, there existed a "need to prevent the imminent destruction of evidence." *King*,

8

563 U.S. at 460. It may be that in *Limares*, because the Government was not certain whether the package was meant for Ramirez, there was more evidence at risk of destruction. But Agent McKeown testified that it was common for recipients of these kinds of sham packages to wash the purple powder off their hands and try destroy the sham narcotics, and law enforcement had an exigent need to prevent Mr. Trainer from doing so here. And as in *Limares*, Mr. Trainer, not law enforcement, created that exigency when he opened the package. Exigent circumstances justified the warrantless search.

### III. Conclusion

For the stated reasons, Mr. Trainer's motion to suppress [98] is denied. Status hearing remains set for May 21, 2025 at 10:00 AM.

E N T E R:

Dated: May 7, 2025

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge